UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:14-cv-00453-MOC-DCK

| | | |
|---|---|---|
| **SCOTT CHAMBERLAIN,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| Vs. | ) | **ORDER** |
| | ) | |
| **SECURIAN FINANCIAL GROUP, INC. and** | ) | |
| **MINNESOTA LIFE INSURANCE COMPANY,** | ) | |
| | ) | |
| Defendants. | ) | |

**THIS MATTER** is before the court on Defendants' Motion for Summary Judgment

(#21). After being fully briefed, the court heard oral arguments on the motion on January 25,

2016. Having considered the motion, briefs, arguments of counsel, and evidentiary record, the

court enters the following findings, conclusions, and Order.

## FINDINGS AND CONCLUSIONS

### I.    INTRODUCTION AND FACTUAL BACKGROUND

The facts of this case are as follows. Defendant Minnesota Life Insurance Company

("Minnesota Life") sells, via a network of independent agents, life insurance products. (Affidavit

of Paul Dwyer, ¶ 3 (hereinafter, "Dwyer Affid.")). Defendant Securian Financial Group ("SFG")

is the parent corporation of Minnesota Life. (Id. ¶ 2). It is also the parent corporation of non-

party Securian Financial Services ("SFS").[1] (Id. ¶ 2). SFS sells, via a network of independent

general agents and registered agents, registered securities products, including variable life

---

1 Defendants have maintained from the outset of this litigation that Defendant SFG is an improperly named party.

-1-

insurance products. (<u>Id.</u> ¶ 4). Independent agents and registered agents must be affiliated with a "general agent" that oversees their work. <u>See, e.g.</u>, (Deposition of Scott Chamberlain, pp. 66, 73-76 (hereinafter "Chamberlain Dep.") (##23, 40); Dep. Ex. 43[2] (showing Dennis Howe as Chamberlain's general agent)). Agents, registered agents, and general agents are paid based solely on commission. (Chamberlain Dep pp. 66, 73-76; Dep. Ex. 43, 44, 45).

In 1994, Plaintiff Chamberlain signed an Agent's Contract with the Minnesota Mutual Life Insurance Company ("MMLIC") (now named Minnesota Life Insurance Company (Defendant)). (Dep. Ex. 43; Chamberlain Dep. pp. 50-54). The Agent's Contract appointed Plaintiff to sell MMLIC life insurance products. (<u>Id.</u>) The appointment was non-exclusive, meaning that Plaintiff did not have exclusive rights on any specific territory, but had to compete with other agents for business. (<u>Id.</u> at p. 2). The Agent's Contract included the following specific language:

> During your agency service, you understand and agree that you are an **<u>independent contractor, not an employee</u>**. Nothing in this contract is intended, nor is it to be construed, to create an employee-employer relationship between you and [General Agent] or between you and us. You are free to use your own judgment: as to the persons from whom you will seek applications; the time which you do it; the place where you do it; and the means by which you do it.

(<u>Id. p. 2</u>) (emphasis added). The Agent's Contract further specifically limited Chamberlain's authority on behalf of MMLIC to three tasks: 1) taking applications; 2) delivering policies; and 3) taking initial premiums. <u>Id.</u> The Agent's Contract also required Chamberlain to obtain his own license and maintain his own surety bond and errors and omissions insurance. (<u>Id.</u> at pp. 2-3). He was required to comply with MMLIC rules and regulations (designed to comply with Financial Industry Regulatory Authority "FINRA" regulations), submit advertising for approval, and

---

2 Deposition Exhibits are available in the record at (#22-2).

satisfy minimum production goals. (<u>Id.</u> at p. 3). At the time Chamberlain signed the Agent's

Contract, he was affiliated with a general agency named the Greater Carolina Group ("GCG").

(Chamberlain Dep. p. 28, 41-42, 51-52). He identified himself as a financial advisor with GCG.

(<u>Id.</u> at pp. 28-29, 39, 99). Dennis Howe, the principal of GCG, became Chamberlain's

supervising agent.

The Agent's Contract could be terminated by any party at any time, with or without

cause. (Dep. Ex. 43, p. 6). To terminate without cause, 15 days written notice was required. (<u>Id.</u>).

After MMLIC changed its name to Minnesota Life on October 1, 1998, Minnesota Life sent

annual contract updates to the Agent's Contract. (Dwyer Affid. ¶ 5; Chamberlain Dep. p. 68). In

1994, Chamberlain also signed an Agent Sales Agreement with MMLIC Sales Corporation to

become a registered representative to sell securities. (Dep. Ex. 45). MMLIC later changed its

name to Ascend Financial Services, Inc., and then to Securian Financial Services (Deposition of

Loyall Wilson, p. 40 (hereinafter "Wilson Dep."); Dwyer Affid. ¶ 6). In 1997, Chamberlain

signed an Agent Sales Agreement with Ascend Financial Services, Inc. to become a registered

representative to sell securities. (Dep. Ex. 44; Chamberlain Dep. pp. 56-58). The Ascend Agent

Sales Agreement provided that the agreement could be terminated by either party at any time,

with or without cause. (Dep. Ex. 44, p. 4). To terminate without cause, the terminating party was

required to give 15 days written notice to the other party. (<u>Id.</u>).

On May 1, 2001, Ascend Financial Services changed its name to Securian Financial

Services, Inc. ("SFS"). (Wilson Dep., p. 40; Dwyer Aff. ¶ 6). Thereafter, annual contract updates

came from SFS. (Dwyer Aff. ¶ 6; <u>see also</u> Dep. Ex. 62; Chamberlain Dep. pp. 62-65; Deposition

of Dennis Howe, p. 59 (hereinafter "Howe Dep.")). Therefore, at the time of his termination in

October 2012, Chamberlain was an Agent with a contract to sell Minnesota Life products and was a Registered Representative with a contract to sell SFS products. (See Dep. Ex. 11).

By both parties' accounts, Plaintiff was a strong salesman and often received rewards for his work, including "Chairman's Club Reward Trips." See (Howe Dep. at p. 20-21); (Chamberlain Aff. (#33-1) at ¶ 19). In March 2012, Chamberlain and his then-wife attended a Chairman's Club cruise in the Caribbean. (Chamberlain Dep. at p. 110). On the cruise, Chamberlain's behavior triggered several complaints from cruise ship staff. (Roach Dep. at p. 47; Dep. Ex. 37 (excerpted), 38, Chamberlain Dep. at pp. 110-13). Defendant states that Chamberlain's behavior included running in the halls in a life jacket instead of attending the mandatory safety drill, being rude to staff, over-ordering room service, and being disruptive at dinner. (Roach Dep. pp. 47-48, 60, 115-116; Dep. Ex. 37, 38). Chamberlain denied that he engaged in disruptive or inappropriate behavior. (Roach Dep. at p. 48). One evening on the cruise, the ship's security team responded to a 911 call from Chamberlain's cabin. (Chamberlain Dep. at p. 115; Roach Dep. at p. 92; Dep. Ex. 37). The accounts of what triggered the call differ. Chamberlain's wife reported to the ship crew that she was assaulted by Chamberlain. (Roach Dep. at pp. 86-87, 93-95; Dep. Ex. 37). Chamberlain claims his wife was intoxicated and assaulted him and that he acted in self-defense. (Chamberlain Aff. (#33-1) at ¶58; Chamberlain Dep. at pp. 114-116.) He denies being drunk at the time. Id. at ¶62. Ultimately, the captain of the ship ordered that Chamberlain be removed from the ship. (Chamberlain Dep. at pp. 116, 120; Roach Dep. at pp. 100, 102; Dep. Ex. 37).

Plaintiff has previously been treated for alcoholism. See (Chamberlain Dep. at p. 20-21; Chamberlain Aff. at ¶53-54). Defendant states that after the cruise incident, individuals at

Minnesota Life and SFS engaged in internal discussions regarding the reports of Chamberlain's behavior on the cruise and that they decided that he posed a reputational risk to the company. (Wilson Dep. at pp. 53-55; 62; Fox Dep. at pp. 81-82, 107-108, 110, 154-56; Dep. Ex. 29). The company then decided that it was willing to maintain Chamberlain as an agent, but only if Chamberlain would agree to certain conditions. (Wilson Dep. at pp. 58-60; Fox Dep. at pp. 119, 147, 157). In the several months after the cruise ship incident, Minnesota Life and SFS discussed those conditions with Dennis Howe, the general agent at GCG. (Fox Dep. at pp. 103, 168, 170; Howe Dep. at pp. 78-79; Dep. Ex. 48). Ultimately, a meeting was held between Chamberlain, Howe, and representatives from Minnesota Life and SFS. (Chamberlain Dep. at p. 128; Wilson Dep. at pp. 55-56; Fox Dep. at pp. 86, 121-22; Howe Dep. at p. 73). After the meeting, Minnesota Life and SFS sent Chamberlain and Howe letters outlining the conditions under which Chamberlain could continue selling their products. See (Chamberlain Dep. at pp. 135-36; Dep. Ex. 9; 10 (#23) at p. 86-87). The letter stated,

> We met recently to discuss our concerns regarding your conduct and how it may threaten our reputation. In light of this information, as an alternative to immediate termination, Minnesota Life Insurance Company ("ML") and Securian Financial Services, Inc. ("SFS") are willing to consider continuing the relationship with you based on the following conditions…

Id. Plaintiff objected to several of the conditions, particularly (1) the requirement to prove attendance at AA; (2) the monthly administrative fee; (3) the reservation of rights to change or add conditions; and (4) the release of all claims, both present and future. (Chamberlain Dep. at pp. 138-145; Fox Dep. at p. 123). Ultimately, Chamberlain refused to agree to the conditions and did not sign the letter. (Chamberlain Dep. at p. 145; Fox Dep. at p. 126).

On October 16, 2012, Minnesota Life and SFS provided written notice to Chamberlain that his contracts with Minnesota Life and SFS were being terminated, effective at the end of the 15-day period following the letter. (Chamberlain Dep. at p. 147; Dep. Ex. 30). After Chamberlain's termination, Dennis Howe terminated GCG's contracts with Minnesota Life and SFS, taking all of his agents with him. (Howe Dep. at pp. 49-51). Chamberlain concedes he had the opportunity to work with GCG. (Chamberlain Dep. at p. 150). Chamberlain, Howe, and the other GCG agents signed with another broker/dealer, Questar. (Howe Dep. at p. 57; Chamberlain Dep. at pp. 150, 154; Dep. Ex.12). However, the relationship between GCG and Chamberlain was terminated in January 2013. See (Howe Dep. at p. 57; Chamberlain Dep. at p. 151). Questar also terminated Chamberlain's FINRA registration. (Dep. Ex. 22).

Plaintiff states that he filed a charge of discrimination with the EEOC in April 2013 and received his right to sue notice.[3] By the complaint, Plaintiff asserts four causes of action against Defendants: 1) violation of the Americans with Disabilities Act; 2) wrongful discharge in violation of public policy; 3) breach of express or implied contract (in the alternative); and 4) unjust enrichment (in the alternative). Defendant has moved for Summary Judgment on all claims.

## II.    SUMMARY JUDGMENT STANDARD

---

[3] The court notes that the EEOC right to sue notice does not appear anywhere in the record. However, in Defendants' Answer to the Complaint (#5), which was removed from state court, Defendants concede that Plaintiff timely filed an EEOC charge. See id. at ¶ 38. As Defendants do not assert any defenses regarding the EEOC notice (i.e. for untimeliness), the court will assume without deciding that the EEOC letter was properly received by Plaintiff and that he exhausted his administrative remedies before filing this lawsuit. See Rudolph v. Buncombe Cnty. Gov't, 846 F. Supp. 2d 461, 477-78 (W.D.N.C.) aff'd, 474 F. App'x 931 (4th Cir. 2012) (holding that before a plaintiff may file a lawsuit alleging an age discrimination claim, "she must first pursue and exhaust administrative remedies which necessarily include filing a timely charge of discrimination with the EEOC.")

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id. The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted). Once this initial burden is met, the burden shifts to the nonmoving party. That party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Instead, that party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). In the end, the

question posed by a summary judgment motion is whether the evidence "is so one-sided that one party must prevail as a matter of law." <u>Anderson</u>, 477 U.S. at 252.

## III.  DISCUSSION

### A.  Americans with Disabilities Act

The Americans with Disabilities Act ("ADA") broadly protects the employment rights of the disabled by providing: "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "To establish a claim for disability discrimination under the ADA, a plaintiff must prove '(1) that she has a disability, (2) that she is a 'qualified individual' for the employment in question, and (3) that [her employer] discharged her (or took other adverse employment action) because of her disability.'" <u>Jacobs v. N.C. Admin. Office of the Courts</u>, 780 F.3d 562, 572 (4th Cir. 2015) (quoting <u>EEOC v. Stowe–Pharr Mills, Inc.,</u> 216 F.3d 373, 377 (4th Cir. 2000)). Plaintiff alleges that he was discharged on the basis of his disability and denied reasonable accommodation for his disability in violation of the ADA. Before reaching the merits of such arguments, the court must determine whether Plaintiff is a "qualified individual" covered by the Act and thus entitled to its protections.

### 1.  <u>Independent Contractor versus Employee Analysis</u>

Defendants argue that Plaintiff is not entitled to relief for his ADA claims because he was an independent contractor, not an employee of Defendant. The ADA defines "employee" as "an individual employed by an employer," 42 U.S.C.A. § 12111(4), and does not extend its

protections to independent contractors. See, e.g., Wojewski v. Rapid City Reg'l Hosp., Inc., 450 F.3d 338, 342 (8th Cir. 2006); Flannery v. Recording Indus. Ass'n of Am., 354 F.3d 632, 642 (7th Cir. 2004); Ratledge v. Sci. Applications Int'l Corp., No. 1:10-CV-239, 2011 WL 652274, at *2 (E.D. Va. Feb. 10, 2011) aff'd, 452 F. App'x 348 (4th Cir. 2011); Collins v. Network Exp., Inc., No. CIV.A 4:07-1564-RBH, 2008 WL 4280382, at *9 (D.S.C. Sept. 12, 2008). For purposes of the ADA, an employment relationship is determined under agency principles and the "economic realities" of the relationship.  See Garrett v. Phillips Mills, Inc., 721 F.2d 979, 981 (4th Cir. 1983); Taylor v. Rite Aid Corp., 993 F. Supp. 2d 551, 563 (D. Md. 2014); Miller v. Ingles, No. CIV. 1:09CV200, 2009 WL 4325218, at *7 (W.D.N.C. Nov. 24, 2009). Under this test, a court must consider several factors, of which control is the most important. Garrett at 983; Butler v. Drive Auto. Indus. of Am., Inc., 793 F.3d 404, 409 (4th Cir. 2015) ("The Supreme Court has held that the common-law element of control, drawn from the law of agency, is the principal guidepost to be followed when construing [a]…claim under the [ADA]. Likewise, the Fourth Circuit has consistently focused on control, especially in the comparable instance where the status of the plaintiff as an employee or independent contractor is at issue.") (internal citations and quotations omitted). Other important considerations include:

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

<u>Garrett</u>, 721 F.2d at 982. <u>See also</u> <u>Farlow v. Wachovia Bank of N. Carolina, N.A.</u>, 259 F.3d 309, 313 (4th Cir. 2001) (citing <u>Community for Creative Non–Violence v. Reid</u>, 490 U.S. 730, 751–52 and applying substantially similar factors). Additionally, "the parties' beliefs regarding the nature of the employment relationship are significant." <u>Id.</u> "Resolution of factors as 'to whether an employment relationship or an independent contractor relationship was created' is 'a question of law.'" <u>Id.</u> (citing <u>Cilecek v. Inova Health System Servs.</u>, 115 F.3d 256, 261 (4th Cir. 1997)). "Merely because employee and independent contractor status is each supported by certain factors does not bar entry of summary judgment." <u>Id.</u>

    *a. Control*

As to the most important factor in the independent contractor/employee analysis, level of control, the court must assess "the degree of control of the professional services rendered rather than 'peripheral, administrative details which were incidental to the rendering of ... services.'" <u>Farlow</u>, 259 F.3d at 313 (quoting <u>Robb v. United States</u>, 80 F.3d 884, 889 (4th Cir. 1996)). Here, Defendant argues that Plaintiff was an independent contractor because he, and to some extent GCG, controlled his own activities. Through required at Monday sales meetings and expected to attend meetings during sales conventions and on rewards trips, he generally set his own hours, scheduled meetings with clients at any time of day, and did not keep a timesheet. (Chamberlain Dep. pp. 76-78). He arranged his own client development events. <u>Id.</u> at 55-56. Although obligated to give Minnesota Life and SFS the right of first refusal for all sales, he could sell other lines of insurance if the client did not want to buy those products. <u>Id.</u> at 48-49. While Defendants trained Plaintiff in certain areas, Plaintiff independently used his skills, knowledge, and training to make sales. Additionally, GCG and Chamberlain, not Minnesota Life or SFS, provided

logistical support for Chamberlain's sales efforts. See (Complt. ¶ 13). ("GCG owner Dennis Howe often acted as Chamberlain's supervisor for his work in the GCG office…").

Plaintiff argues that he was an employee because he was supervised through Defendants' mandatory training, (Chamberlain Affidavit (#33-1) at ¶¶ 49-50; Roach Dep. at p. 22);  testing and audits (Wilson Dep. at pp. 23-24); compliance with policy manuals, (Wilson Dep. at pp. 17-19; Howe Dep. at p. 59); licensing requirements (Wilson Dep. at pp. 27-28); approval of advertising (Wilson Dep. at pp. 26-27; Chamberlain Aff. at ¶ 31); attendance at meetings and conventions, and being subject to discipline. Plaintiff argues that he was not free to establish his own selling methods and was subject to a high level of Defendants' control.  Defendant also states that he was placed on "heightened supervision," (Chamberlain Dep. Ex. 53), and that he was subjected to supervision by Dennis Howe of GCG, and Perry Fox of Minnesota Life and Securian. (Chamberlain Aff. at ¶37-38). Plaintiff also states that he was disciplined if he did not comply with the testing requirements and denied compensation until compliance was present. (Id. at ¶ 30-31).

By his briefing, Plaintiff argues that the following issues of material fact are present on the question of control: 1) whether his time was monitored through required meetings and required attendance at client events, sales meetings, and annual conferences; 2) that he was not free to and did not select all of his clients, as many were "orphans" or others assigned to him by Minnesota life and GCG, see (id. at ¶36); and 3) Minnesota Life required him and other agents to sell their way—providing extensive training and repeated testing. See Pl. Resp. (#33) at p. 19.

Defendant notes that several of Plaintiff's own statements belie these contentions regarding disputed facts, and argues that even if disputed, many of them are not material. While

Defendants make no rebuttal to Plaintiff's arguments about orphan clients, the court does not find that fact to be material. As to the amount of time he was monitored, Defendants do not appear to dispute that Plaintiff was required to attend Monday morning GCG sales meetings, but note that in Plaintiff's deposition, he stated that "nobody demanded that [he] be in the office" (Chamberlain Dep. at p. 78) and that he was able to set up his own preferred hours to meet with his clients. See (id. at pp. 79-80). Defendants also note that when testifying about business meetings on Minnesota Life/SFS trips, Plaintiff stated that for some of the supposedly required meetings and presentations, he "basically would not show up at those things." Id. This prior testimony from Plaintiff is consistent with the testimony from Minnesota Life's and Securian's Director of Meetings and Conference Management—that no one was required to attend sales conventions or leadership conferences for which they qualify. (Roach Dep. at pp. 12-13; 7-8).

Regarding the fact that Plaintiff was required to sell in accordance with procedures set by Defendants, Defendants note that Plaintiff downplayed the extent to which he actually made sales in recent years at his deposition. When asked about whether he was required to work a certain number of hours in a week, Plaintiff testified that he "had hit a point in [his] career that everything [he] touched turned to gold" and that "[i]t wasn't selling anymore." (Chamberlain Dep. at 77-78.) He "would go in and meet with [his] big clients," and "the client was more like, 'How much do I need to write the check for?'" Id. He also testified that when he had company representatives come in to talk to his clients or potential clients, approximately 30% to 40% of the time those representatives would be from another company, not from Minnesota Life or SFS. Id. at 180. In addition, he admitted that that he was actually noncompliant with the SFS policies

and procedures. Id. at 98. While such evidence does not completely rebut Plaintiff's claims regarding required sales procedures, the court has considered it at this stage in the proceedings.

While the court finds that Plaintiff has pointed to some facts in the record showing that he is subject to the control of Defendants to a certain extent, the court believes that the facts here ultimately weigh in favor of finding an independent contractor relationship. Plaintiff is certainly subject to control in that he is held to certain requirements of professionalism and required to sell Defendants' products in a certain manner, but the degree of control that Defendants had over Plaintiff's actual rendering of professional services is significantly less than that found in traditional employer relationships. Additionally, the court finds it significant that Plaintiff sets his own hours and handled client meetings on his own schedule. Additionally, he attested that he did not actually attend events that were supposedly required of him, thus indicating that he was not subject to complete control of Defendants.

   b.  *Other factors*

      *(1) Type of occupation*

Insurance salespeople have routinely been found to be independent contractors by courts examining the issue. See, e.g., Birchem v. Knights of Columbus, 116 F.3d 310, 313 (8th Cir. 1997) ("federal courts have consistently held that insurance agents are unprotected independent contractors…"); Murray v. Principal Fin. Grp., Inc., 613 F.3d 943, 944 (9th Cir. 2010) ("We, along with virtually every other Circuit to consider similar issues, have held that insurance agents are independent contractors and not employees for purposes of various federal employment statutes.") (collecting cases from 6th, 8th, and 9th Circuits regarding decisions under the Employee Retirement Income Security Act, the Age Discrimination in Employment Act, and

Title VII). The court finds such decisions to be informative to the facts presented here. The court also finds it relevant to Plaintiff's occupation that he did not have exclusive rights on any specific territory with Minnesota Life or SFS; he had to compete with other agents for business. (Dep. Ex. 43). Additionally, the Agent's Contract Plaintiff signed required Plaintiff to obtain his own license and maintain his own surety bond and errors and omissions insurance. Id. The court finds that this factor weighs against finding an employment relationship.

> *(2) Skill required for the occupation*

At oral argument, Plaintiff stated that the type of work performed in the course of his duties do not require a particularly high degree of skill. Defendants do not appear to dispute this argument, and note that the Agent's Contract makes clear that Plaintiff had limited authority to act on behalf of the company. His authority was limited to three tasks: (1) taking applications; (2) delivering policies; and (3) taking initial premiums. (Dep. Ex. 43). However, the court notes that Plaintiff was very skilled at making sales, and was in fact rewarded for being a top salesman. The Agent's Contract also required Chamberlain to obtain his own license. Id. Additionally, the court notes that other courts examining the issue have found that on this prong, the skill required for a job as an insurance agent weighs against employee status. See Schwieger v. Farm Bureau Ins. Co. of NE, 207 F.3d 480, 485 (8th Cir. 2000); Weary v. Cochran, 377 F.3d 522, 527 (6th Cir. 2004). The court finds that this factor weighs slightly against finding an employment relationship. See Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 752 (1989) (finding skilled occupation such as sculptor weighs in favor of independent contractor relationship).

*(3) Who furnished the equipment used at the place of work*

GCG (not Defendants) provided and paid for office space, staffing, secretarial help, computers, supplies, and administrative assistance for Plaintiff's use. (Chamberlain Dep. at p. 94; Dep. Ex. 35; Compl. ¶ 13). This factor weighs against finding an employment relationship between Plaintiff and Defendants.

*(4) Length of time worked*

Plaintiff worked for Minnesota Life, Securian, and GCG Wealth Management for nearly nineteen years, from 1994 through October 2012. The court finds that this factor weighs in favor of finding an employment relationship. See Cilecek v. Inova Health Sys. Servs., 115 F.3d 256, 262 (4th Cir. 1997) ("that the relationship was an enduring one might suggest the regularity inherent in an employment relationship.").

*(5) Method of payment*

The record indicates that Chamberlain was compensated solely based on his sales. (Chamberlain Dep. at pp. 66, 73-74, 75; Dep. Ex. 62). Compensation included commissions, production bonuses, overrides, and reward events such as sales conventions and trips. (Id. at pp. 66, 75; Fox Dep. at pp. 74-78). Every form of payment was based on the value of policies sold. (Chamberlain Dep. at pp. 73-76). This factor weighs against finding an employment relationship. See Farlow v. Wachovia Bank of N. Carolina, N.A., 259 F.3d 309, 315 (4th Cir. 2001) ("the absence of regular, periodic payments is an indicia of independent contractor status.") (internal citations and quotation marks omitted); Weary v. Cochran, 377 F.3d 522, 527 (6th Cir. 2004) ("the fact that [plaintiff] was paid solely upon a commission basis and did not earn a salary lends further support to the conclusion that he was an independent contractor.").

*(6) How the relationship is terminated*

The Agent's Contract between Plaintiff and Minnesota Life could be terminated by any party at any time, with or without cause. See (Dep. Ex. 43, p. 6). To terminate without cause, 15 days written notice was required. Id. The court finds this factor to be neutral. See Cilecek, 115 F.3d at 262 ("that either party had a right to terminate the relationship is not indicative [of an employer or independent contractor relationship].")

*(7) Whether annual leave is available*

Plaintiff was not paid for any vacation time or sick leave, see (Chamberlain Dep. at p.79-80), which weighs against finding an employment relationship. See Farlow, 259 F.3d at 315 (finding the fact that the plaintiff did not receive paid vacation weighed in favor of independent contractor status); Schwieger v. Farm Bureau Ins. Co. of NE, 207 F.3d 480, 486 (8th Cir. 2000) (finding that the lack of any leave or vacation policy weighed against finding employment status).

*(8) Whether work is an integral part of employer's business*

Clearly, sales of securities and life insurance products are integral to Defendants' business. This factor thus weighs in favor of finding an employment relationship. See, e.g., Weary, 377 F.3d at 528 (finding the fact that work was a regular part of the hiring party's business weighed in favor of employee status).

*(9) Whether the employer provides retirement benefits*

Based on his sales production, Plaintiff was eligible to participate in voluntary benefits and retirement programs. (Chamberlain Dep. at p. 93; Fox Dep. at pp. 39-40; Dep. Ex. 1). Chamberlain was provided benefits, including medical, dental and vision, as well as various

other benefits, by Minnesota Life. (Chamberlain Aff. at ¶¶ 16-18). This factor weighs in favor of finding an employment relationship. See Cilecek, 115 F.3d at 261 (finding that failure of putative employer to provide benefits weighed against finding an employment relationship); Farlow, 259 F.3d at 315 (same).

(10) *Whether the employer pays social security taxes; other tax-related considerations*

The facts related to tax and other financial considerations indicate somewhat mixed results in this case. For commissions earned from SFS, and for the value of reward sales conventions and trips, Chamberlain received 1099 tax forms (used to report income of non-employees), see (Chamberlain Dep. p. 84), which weighs against finding an employer relationship. See, e.g., Farlow, 259 F.3d at 312. Additionally, Minnesota Life withheld no state or federal income tax. (Dep. Ex. 63; Chamberlain Dep. at pp. 85-86). Plaintiff was also responsible for filing his own taxes, and took business expenses as deductions (e.g., newsletter, cellphone, education, customer gifts/events, parking, conference expenses, marketing, and dictation services). (Chamberlain Dep. at pp. 85-86, 88-92; Dep. Exs. 63, 64; Defs. Br. at 9). All of these factors weigh against finding an employment relationship. See, e.g., Farlow, 259 F.3d at 312. However, for commissions earned from Minnesota Life, Chamberlain received a W-2 as a statutory employee and due to his W-2 status, Minnesota Life paid FICA and social security taxes for Chamberlain. (Dep. Ex. 63; Chamberlain Dep. at p. 86). These facts weigh in favor of finding an employment relationship. See, e.g., Farlow, 259 F.3d at 312. The Sixth Circuit, when faced with similar facts as those here—an insurance salesman whose putative employer withheld social security taxes from commissions but deducted losses and profits on his tax returns—found that the balance swayed in favor of independent contractor status. See Weary, 377 F.3d at 528.

The court similarly finds here that the balancing of these factors weigh against finding an employment relationship.

*(11) Intention of the parties*

The Agent's Contract that Plaintiff signed stated that he understood and agreed that he was an independent contractor, not an employee. (Dep. Ex. 43 (#22-2 at pp. 51-58)). The agreement states:

> During your agency service, you understand and agree that you are an ***independent contractor, not an employee***. Nothing in this contract is intended, nor is it to be construed, to create an employee-employer relationship between you and [General Agent] or between you and us.

Id. Thus, the stated intent of the parties clearly weighs against finding an employment relationship.

*(12) Parties' beliefs regarding the nature of the employment relationship*

Plaintiff has not offered any evidence indicating that he at any time thought he was an employee of Defendants or that he was improperly classified as such. Plaintiff in fact stated several times at his deposition that he identified himself as a financial advisor with GCG, not as an employee of Defendants. (Chamberlain Dep. at pp. 28-29, 39, 99; Dep. Ex. 20; Defs. Br. at p. 5). This factor thus weighs against finding an employment relationship.

### c. *Conclusion as to Employment Status*

Having considered the balance of the applicable factors, the court finds that Plaintiff's employment relationship with Defendants was that of an independent contractor, not employee. The court also finds support for such conclusion in several decisions from the Fourth Circuit and district courts within the Circuit. See, e.g., Daniell v. Old Line Life Ins. Co. of Am., 947 F. Supp. 910, 914 (E.D.N.C.) aff'd, 101 F.3d 695 (4th Cir. 1996) (finding that plaintiff life insurance

salesperson was an independent contractor given the express agreement to that effect, the low

level of control over sales activities, income based on commission, choice to sell any type of life

insurance with any method, ability to set own hours, and no compensation for vacation or sick

time); Farlow v. Wachovia Bank of North Carolina, 259 F.3d 309 (2011) (finding attorney to be

an independent contractor where her contract so stated; received a 1099 tax form as opposed to a

W-2; putative employer did not withhold taxes or pay social security; did not receive a salary but

was compensated when she submitted bills; did not receive paid vacation, long-term disability or

life insurance nor participate in retirement plan; and did not receive any letterhead or business

cards; even though Defendant provided office space, car, computer, and supplies; paid for CLE;

controlled when she had access to her office, required her to attend staff meetings and comply

with a dress code); Garrett v. Phillips Mills, Inc., 721 F.2d 979, 982 (4th Cir. 1983) (finding that

Plaintiff was an independent contractor because parties expressly agreed so; plaintiff was largely

independent of Defendants' control, was not required to report daily activities, chose his working

hours, chose his method of sales and was free to sell products of other companies, paid his own

operating expenses; earned profit based on sales performance; tax returns identified him as self-

employed; and was responsible for withholding his own income and social security taxes).

Because the court finds that Plaintiff was an independent contractor, not an employee of

Defendants, he was not entitled to protection under the ADA. Accordingly, his ADA claims, as

well as his claims for wrongful discharge in violation of public policy, both must fail. See infra

(discussing legal standards providing that wrongful discharge is analyzed under the same

analysis as ADA); Moser v. Driller's Serv., Inc., 988 F. Supp. 2d 559, 565 (W.D.N.C. 2013)

(same).

## 2. **Alternative Analysis of Plaintiff's Prima Facie Case**

Though the court finds that Plaintiff is an independent contractor and thus not entitled to the

protections of the ADA, it has considered whether, if Plaintiff were an employee and thus a

"qualified individual" under the ADA, his claims would succeed at this stage in the proceedings.

For the reasons explained herein, the court finds that Plaintiff's claims related to disability

discrimination would fail even if he were considered an employee within the meaning of the Act.

### a. Whether Plaintiff is Disabled within the Meaning of the ADA

The ADA prohibits covered employers from discharging qualified employees because

they are disabled. 42 U.S.C. § 12112(a). To establish a prima facie ADA disability

discrimination claim, plaintiff must first show that he is disabled within the meaning of the Act.

Pollard v. High's of Bait., Inc., 281 F.3d 462, 467 (4th Cir. 2002); Summers v. Altarum Inst.,

Corp., 740 F.3d 325, 328 (4th Cir. 2014). The ADA defines "disability" as: "(A) a physical or

mental impairment that substantially limits[4] one or more major life activities of such individual;

(B) a record of such an impairment; or (C) being regarded as having such an impairment (as

described in paragraph (3))." 42 U.S.C. § 12102(1).[5]

---

[4] EEOC regulations provide, "[a]n impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). However, the impairment "need not prevent, or significantly or severely restrict, the individual from performing a major life activity" to be "substantially limiting." Id. "The term 'substantially limits' shall be construed broadly in favor of expansive coverage" and is "not meant to be a demanding standard." Id. § 1630.2(j)(1)(i). Examples of "major life activities" include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working" and operation of a major bodily function. Id. § 1630.2(i)(1).

[5] The court notes that it applies the standards articulated in the ADA Amendments Act ("ADAAA"), which took effect January 1, 2009. See ADAAA, Pub. L. No. 110–325, 122 Stat. 3553 (2008); 29 U.S.C.A. § 705. Here, because the alleged discriminatory conduct—terminating Plaintiff after he failed to sign an agreement imposing additional terms on his working relationship with Defendants—occurred in August 2012, the court will apply the standards of the ADAAA. See Bennett v. Kaiser Permanente, 931 F. Supp. 2d 697, 707 (D. Md. 2013) (discussing

Plaintiff contends by briefing and statements made at oral arguments that he is disabled simply by virtue of being an alcoholic under the first, "actual disability" prong.[6]  Such contention has been repeatedly rejected by courts as inconsistent with the definition of disability set forth in the ADA. See, e.g., Bailey v. Georgia-Pac. Corp., 306 F.3d 1162, 1167-68 (1st Cir. 2002) ("An ADA plaintiff must offer evidence demonstrating that the limitation caused by the impairment is substantial in terms of his or her own experience. Alcoholism is no exception; courts have generally refused to recognize alcoholism as a per se disability under the ADA.") (internal citations omitted); Burch v. Coca-Cola Co., 119 F.3d 305, 316 (5th Cir. 1997) (finding that alcoholism is not a per se disability); Barron v. Decare Dental, LLC, No. CIV. 12-699 RHK/SER, 2013 WL 3989786, at *4, n. 10 (D. Minn. Aug. 2, 2013). Notably, the Fourth Circuit has held that "[u]nquestionably, drug addiction constitutes an impairment under the ADA." A Helping Hand, LLC v. Baltimore Cnty., MD, 515 F.3d 356, 367 (4th Cir. 2008) (collecting cases and other authority). "However, '[m]erely having an impairment does not make one disabled for purposes of the ADA.'" Id. (quoting Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 195 (2002)).

---

non-retroactivity of ADAAA as articulated by the Fourth Circuit). The distinction between the ADA and ADAAA is significant, as "Congress broadened the definition of 'disability' by enacting the [ADAAA]....In response to a series of Supreme Court decisions that Congress believed improperly restricted the scope of the ADA, it passed legislation with the stated purpose of reinstating a broad scope of protection to be available under the ADA." Summers v. Altarum Inst., Corp., 740 F.3d 325, 329 (4th Cir. 2014) (internal citation and quotation omitted). The ADAAA provides that the definition of disability "shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by [its] terms," 42 U.S.C. § 12102(4)(A), and that the term "substantially limits" be interpreted consistently with the broadened scope of the ADAAA. Id. § 12102(4)(B).

6 By the complaint, Plaintiff also seemed to assert that his attention deficit disorder ("ADD") constituted a disability, but when questioned at oral arguments about whether he still contended that his ADD constituted a disability within the meaning of the ADA, Defendant conceded that there was no evidence in the record to that effect. The court will thus only discuss Plaintiff's allegations of disability due to alcoholism.

Here, Plaintiff does not articulate how his impairment of alcoholism "substantially limit[ed]" his ability to perform any "major life activities," which is a required showing under the Act. In fact, Plaintiff indicated on the face of his Complaint that no one had ever informed him that he was seen to be drunk at work or that his alcoholism had ever affected his work performance. See Complaint at ¶ 32. Plaintiff reiterates the argument that his alcoholism had no effect on his work in his briefing. See, e.g., Pl. Resp. (#33) at pp. 20-21. As Plaintiff correctly notes, there is no evidence in the record that he ever had any difficulties performing his job due to his alcoholism. Plaintiff stated in his deposition that he was sober for nine years but relapsed in October 2011, a few months before the cruise incident. See Chamberlain Dep. at pp. 133-43 ((#23) at pp. 61-62). He also admitted to drinking at various times on the cruise in March 2012, see id., but stated in his affidavit that he was "not drunk on the trip." See (#33-1) at p. 13. Similarly, while Plaintiff states in his complaint and brief that he has a record of an impairment, and therefore argues that he meets the second prong of the disability definition, the fact that he has been diagnosed as an alcoholic and sought treatment for such impairment is insufficient to show that he is disabled with the meaning of the ADA. See 29 C.F.R. § 1630.2 ("An individual has a record of a disability if the individual has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities."); Adams v. Rice, 531 F.3d 936, 946 (D.C. Cir. 2008). Because there is no evidence as to how Plaintiff's alcoholism "substantially limits" any major life activities, Plaintiff does not meet the definition of disabled on either the first or second prongs.

Finally, the court has considered whether Plaintiff has met the requirement for showing that he is "regarded as" disabled on the third prong. The "regarded-as prong" is subject to the following requirements:

> [a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

Id. § 12102(3)(A). Thus, the perception of the employer becomes the relevant inquiry for the court. See Hilton v. Wright, 673 F.3d 120, 129 (2d Cir. 2012) (holding that under ADAAA, a plaintiff only had to show at summary judgment that a genuine issue of material fact existed as to whether the employer "regarded him as having a mental or physical impairment ... [and] was not required to present evidence of how or to what degree [the employer] believed the impairment affected him."); Horsham v. Fresh Direct, No. 14-CV-651 MKB, 2015 WL 5692908, at *6 (E.D.N.Y. Sept. 28, 2015) ("Whether an individual is regarded as having a disability turns on the employer's perception of the employee and is therefore a question of intent, not whether the employee has a disability.") (internal citations and quotations omitted); Sowell v. Kelly Servs., Inc., No. 14-CV-3039, 2015 WL 5964989, at *10 (E.D. Pa. Oct. 14, 2015) ("What is relevant here is the employer's perception."). Plaintiff need only show that Defendants believed that Plaintiff had a mental or physical impairment, not that such impairment affected him to any specific degree.

Plaintiff contends that the additional terms that Defendants sought to impose on the conditions of his employment show that he was "regarded as" an alcoholic by his employer and punished for his impairment. Plaintiff notes that the additional terms to which Defendants wanted Plaintiff to agree included conditions not imposed on other employees, including proving

attendance at Alcoholics Anonymous meetings, submitting to random drug tests, and a zero tolerance policy for drug and alcohol use both on and off the job. <u>See</u> Chamberlain Dep. Ex. 9, 10 ((#23) at pp. 85-90). In light of the ADAAA's instruction that "[t]he definition of disability…shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter," 42 U.S.C.A. § 12102(4)(A), and because Plaintiff has pointed to evidence that could lead a jury to find that Defendants regarded Plaintiff as having an impairment, the court finds that Plaintiff has made the requisite showing at this stage in the proceedings that an issue of material fact exists as to whether he is disabled within the meaning of the ADA by virtue of being "regarded as" disabled.

**3.  <u>Allegation of Unlawful Termination</u>**

"Disability discrimination may be proven through direct and indirect evidence or through the <u>McDonnell Douglas</u> burden-shifting framework." <u>Jacobs v. N.C. Admin. Office of the Courts</u>, 780 F.3d 562, 572 (4th Cir. 2015). At this summary judgment stage, Plaintiff must establish the <u>prima facie</u> elements of his claims for wrongful termination under the ADA, which may be met by utilizing either direct or circumstantial evidence. <u>See</u> <u>Fields v. Verizon Servs. Corp.</u>, 493 Fed.Appx. 371, 375 (4th Cir.2012). Direct evidence is "conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision…Even if there is a statement that reflects a discriminatory attitude, it must have a nexus with the adverse employment action." <u>Warch v. Ohio Cas. Ins. Co.</u>, 435 F.3d 510, 520 (4th Cir. 2006).

Plaintiff does not articulate which legal framework under which he pursues his ADAAA claims. <u>See</u> Pl. Resp. (#33) at p. 19. However, the relevant evidence here is that individuals from

Minnesota Life and SFS discussed Plaintiff's behavior on the cruise ship with him after he was kicked off the cruise, then presented him with additional terms to which he had to agree in order to maintain his relationship with them, and ultimately ended the agency relationship when Plaintiff did not agree to those additional terms. See Chamberlain Dep. at pp. 128-47. The court does not believe that such evidence constitutes direct evidence of discrimination. As such, it will assess Plaintiff's claims under the now-familiar McDonnell Douglas burden-shifting framework. See Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 58 (4th Cir. 1995); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

To prevail under the McDonnell Douglas framework, Plaintiff must first establish a prima facie case of unlawful discrimination. Jacobs, 780 F.3d at 575. If Plaintiff does so, the burden of production shifts to Defendants to articulate a legitimate, nondiscriminatory reason for the termination. Id. at 575-76. Once Defendants have met their burden, the burden shifts back to Plaintiff to demonstrate that Defendants' proffered reason is not the true reason, but a mere pretext for discrimination. Id.

To state a prima facie claim of discrimination based on termination of employment, Plaintiff is required to show sufficient evidence at summary judgment "to demonstrate that: (1) he was a qualified individual with a disability; (2) he was discharged; (3) he was fulfilling h[is] employer's legitimate expectations at the time of discharge; and (4) the circumstances of h[is] discharge raise a reasonable inference of unlawful discrimination." Reynolds v. Am. Nat. Red Cross, 701 F.3d 143, 150 (4th Cir. 2012) (citation and internal quotation marks omitted). "Evidence of all four of these elements is necessary to survive summary judgment." Id.

As noted above, the court has found that Plaintiff meets the first prong of this test at this stage in the proceedings. Neither party disputes that Plaintiff was discharged, and Plaintiff thus satisfies the second prong. On the third prong, both parties agree that Plaintiff was a strong salesman, but Defendants argue that he was not meeting their legitimate expectations at the time of discharge because they believed he acted inappropriately on the cruise and refused to agree the additional terms of employment, which Defendants claim were aimed at preventing him from engaging in similar acts of misconduct. A court considering this prong may look at evidence of an employee's unsatisfactory job performance, even if that alleged deficient performance was the event that caused the termination. Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 515-16 (4th Cir. 2006). However, the fact that the single unsatisfactory incident is the cause of the termination does not necessarily mean that summary judgment should be granted in Defendants' favor. Indeed, the Fourth Circuit stated in Warch that it was "cognizant of the danger that courts might apply the 'expectations' or 'qualification' element of the prima face too strictly in some cases, resulting in the premature dismissal of potentially meritorious claims of unlawful discrimination." Id. at 516. Where Plaintiff's "evidence creates an issue of fact as to whether…the stated reasons for Plaintiff's termination-were simply a 'sham designed to hide the employer's discriminatory purpose,' and, therefore, not 'legitimate,'" summary judgment on the third prong is inappropriate. Young v. CareAlliance Health Servs., No. 2:12-2337-RMG, 2014 WL 4955225, at *4 (D.S.C. Sept. 29, 2014). Here, in the light most favorable to Plaintiff, the court finds that Plaintiff has at least raised a genuine issue of material fact as to whether he was performing in accordance with his employer's legitimate expectations. While Plaintiff does not deny that he was kicked off the cruise ship, there is simply no evidence in the record to indicate

that this incident affected his <u>job performance</u>. While the court finds it reasonable to consider that Plaintiff, by all accounts, was involved in misbehavior on a cruise sponsored by his "employer," the court finds that it cannot grant summary judgment to Defendants based on this alleged failure of Plaintiff to meet employer expectations in a capacity unrelated to the essential functions of his job, especially when considered in light of Plaintiff's eighteen years of strong sales and good working relationship with Defendants.

As to fourth prong, whether the circumstances of Plaintiff's discharge raise a reasonable inference of unlawful discrimination on the basis of his alcoholism, the court finds that the additional terms to which Defendants wanted Plaintiff to agree, including the requirement to prove attendance at AA and submit to random drug testing, at least raise an inference of discrimination on the basis of a perceived disability.

Defendants argue that even assuming Plaintiff has made out a <u>prima facie</u> case, they have articulated a legitimate, non-discriminatory reason for terminating Plaintiff—that he failed to sign the additional terms of employment. Courts have frequently found that an employee's failure to comply with the terms of a "last chance agreement" constitute a legitimate reason for terminating an employee with substance abuse problems. <u>See, e.g.</u>, <u>Klaper v. Cypress Hills Cemetery</u>, No. 10-CV-1811 NGG LB, 2014 WL 1343449, at *7 (E.D.N.Y. Mar. 31, 2014) <u>aff'd</u>, 593 F. App'x 89 (2d Cir. 2015) ("Even if Plaintiff could establish his prima facie case under the ADA, Plaintiff's violation of the last chance stipulation constituted a legitimate, nondiscriminatory justification for CHC's decision to terminate his employment."); <u>Nicholson v. W. Penn Allegheny Health Sys.</u>, No. CIV.A. 06-0814, 2007 WL 3120275, at *11 (W.D. Pa. Oct. 23, 2007) <u>aff'd</u>, 297 F. App'x 157 (3d Cir. 2008) ("Numerous courts have upheld the validity of

last chance agreements under the ADA."). The Third Circuit has noted that "employers do not violate the ADA merely by entering into return-to-work agreements that impose employment conditions different from those of other employees." Ostrowski v. Con-Way Freight, Inc., 543 F. App'x 128, 131 (3d Cir. 2013) (citation omitted). Indeed, several Circuit Courts of Appeal "have explicitly endorsed agreements that bar an employee from consuming alcohol—whether at the workplace or otherwise…" Id. See also Longen v. Waterous Co., 347 F.3d 685, 689 (8th Cir. 2003) ("all return-to-work agreements, by their nature, impose employment conditions different from those of other employees. As a result, courts have consistently found no disability discrimination in discharges pursuant to such agreements.") (collecting cases); Mararri v. WCI Steel, Inc., 130 F.3d 1180 (6th Cir. 1997). Here, as in all of the above-cited cases, Defendants asked Plaintiff to agree to additional terms related to his alcoholism as a condition of maintaining his employment relationship with Defendants. Though Plaintiff did not ultimately agree to the terms of the last chance agreement, the court does not find that distinguishing fact to be overly significant in determining whether the failure to sign the agreement constitutes a legitimate, non-discriminatory reason for terminating Plaintiff.

At oral arguments, Plaintiff conceded that last chance agreements are appropriate tools for employers to use in addressing drug and alcohol substance abuse issues faced by their employees. He also argued that the proposed terms here at least create a question of fact for the jury because the agreement did not simply require Plaintiff to behave better or adhere to a certain level of professionalism. However, as noted above, employers are entitled to impose such conditions. Additionally, Plaintiff argues that the offered agreement at issue here "went too far" because of the proposed prospective release, proof of AA attendance (which would be difficult if

not impossible, as such meetings are, by their nature and name, anonymous), the restrictions to drinking both on and off the job, and the provision allowing Defendants to impose additional terms at any time. As noted above, however, courts have routinely found that simply imposing conditions related to an employee's alcohol abuse, both on and off work time, or singling them out for treatment not required of other employees, is a permissible and reasonable method of attempting to accommodate a substance abuse problem. See, e.g., Longen, 347 F.3d 685, 689 (8th Cir. 2003); McKey v. Occidental Chem. Corp., 956 F. Supp. 1313, 1319 (S.D. Tex. 1997). Plaintiff offers no legal support for his argument that the proposed terms of the last chance agreement at issue here are any more restrictive or unreasonable than other such agreements found to be appropriate by other courts. This court, having considered the issue, does not find it so. Accordingly, the court finds that Defendants have presented a legitimate, non-discriminatory reason for terminating Plaintiff—he chose not to sign a last chance agreement which largely mirrors others consistently upheld by federal courts.

Defendants also argue on the point of offering a legitimate, non-discriminatory reason for terminating Plaintiff that his own statements indicate that he did not believe he was fired for a discriminatory reason. When asked in his deposition why he thought Minnesota Life and Securian terminated his contract, Plaintiff stated that he thought that Kolleen Roach and George Connelly did not want him there anymore because he "didn't fit the mold" of the companies. See Chamberlain Dep. at p. 148-49. By this, Plaintiff explained that he "spoke out," was "willing to challenge them," asked questions that other employees "wanted to know but [were] too afraid to ask," and generally "rocked their boat a little too hard." Id. at p. 149. He reiterated that this is why he thought they "wanted him gone from the company." Id. at 149-50. Most significantly,

Plaintiff made no mention of his alcoholism in response to this line of questioning. See id.

Plaintiff later stated by an affidavit:

> I have read the brief of the Defendants where they cited from my deposition where I was asked about the reason I thought I was terminated. I do believe one reason was the fact that I did not fit their mold and asked a lot of questions. However, I do also believe that the fact that I was an alcoholic was a reason that they discriminated against me, refused to change any of the terms of the Additional Supervision conditions letter, and ultimately, fired me.

Pl. Aff. (#33-1) at ¶ 78. However, the court is not required to accept Plaintiff's later testimony as creating a genuine issue of material fact on the issue of discriminatory termination where submitted affidavits are inconsistent with prior testimony. See Rohrbough v. Wyeth Labs., Inc., 916 F.2d 970, 976 (4th Cir. 1990).[7] Because the court does not find that the proffered last chance agreement was discriminatory, and because Plaintiff's later attempts to rehabilitate his statements made in deposition fall short of creating a genuine issue of material fact on the issue, the court finds that Defendants have met the third prong by showing a legitimate, non-discriminatory reason for terminating Plaintiff's employment.

---

[7] On a motion for summary judgment, a movant may demonstrate "that a genuine issue of material fact exists by referencing matters in the record, including depositions and affidavits." In re Family Dollar FLSA Litig., 637 F.3d 508, 512 (4th Cir. 2011) (citing Fed.R.Civ.P. 56(c)). A movant may not, however, "create a dispute about a fact that is contained in deposition testimony by referring to a subsequent affidavit of the deponent contradicting the deponent's prior testimony, for 'it is well established that a genuine issue of fact is not created where the only issue of fact is to determine which of the two conflicting versions of a party's testimony is correct." Id. (citing Erwin v. United States, 591 F.3d 313, 325 n. 7 (4th Cir. 2010)). Indeed, the Fourth Circuit has repeatedly noted that:

> If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.

Id. at 513 (4th Cir. 2011) (citing Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984)). Accordingly, courts are to disregard assertions in affidavits that are inconsistent with prior testimony when deciding whether to grant summary judgment where a "bona fide inconsistency" exists between the earlier and later testimony. See Rohrbough v. Wyeth Labs., Inc., 916 F.2d 970, 976 (4th Cir.1990); Spriggs v. Diamond Auto Glass, 242 F.3d 179, 185 n. 7 (4th Cir. 2001).

Turning to the final step—which requires Plaintiff to rebut Defendants' statement regarding a legitimate, non-discriminatory reason for terminating Plaintiff's employment by showing that such reason was mere pretext for discrimination—the court notes that Plaintiff nowhere mentions the word "pretext" in his brief, but does seem to assert evidence of pretext by way of comparator evidence. See, e.g. (Pl. Resp. (#33) at p. 13-14) (discussing testimony from Ms. Roach that historically, there had been several instances of misconduct at Chairman's Club events, including destruction of property, a physical fight, a domestic altercation, and being kicked out of a hotel due to noisiness). To show pretext, Plaintiff may introduce evidence to show that "the employer's proffered explanation is unworthy of credence," Holland v. Washington Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007), such as evidence "that other employees who were similarly situated to the plaintiff (but for the protected characteristic) were treated more favorably." Laing v. Fed. Exp. Corp., 703 F.3d 713, 719 (4th Cir. 2013) (citing McDonnell Douglas, 411 U.S. at 804). Where "plaintiffs have based their allegations completely upon a comparison to an employee from a non-protected class, and therefore the validity of their prima facie case depends upon whether that comparator is indeed similarly situated….plaintiffs are required to show that they are similar in all relevant respects to their comparator." Haywood v. Locke, 387 F. App'x 355, 359 (4th Cir. 2010) (citations omitted). "Such a showing would include evidence that the employees 'dealt with the same supervisor, [were] subject to the same standards and ... engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" Id. (citing Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)). "Similarly situated employees are alike with respect to performance, qualifications, and conduct. Generally, the compared employees must

have dealt with the same decision-maker and engaged in conduct of comparable seriousness…an employee need not show complete identity in comparing himself to the better treated employee, but he must show substantial similarity." Popo v. Giant Foods LLC, 675 F. Supp. 2d 583, 589 (D. Md. 2009) (internal citations and quotation marks omitted).

Though Plaintiff argues that other agents of Defendants misbehaved on work trips and at other events, see (Pl. Resp. (#33) at p. 13-14), Plaintiff's factual assertions as to his co-workers' misconduct falls far short of showing that they are "similarly situated" within the meaning of the employment discrimination analysis outlined above. Perhaps most significantly, Plaintiff has failed to explain how other poor behavior is tantamount to getting into a physical altercation with a spouse that resulted in an emergency call, and ultimately being kicked off of a cruise ship.

Given that Defendants have offered a legitimate reason for discharging Plaintiff, and Plaintiff has failed to offer any evidence that would allow a jury to determine that such reason was mere pretext, the court finds that under this alternative analysis of Plaintiff's claim for a discriminatory discharge on the basis of a disability, Plaintiff's claim would not survive summary judgment even if he were an employee within the meaning of the ADA.

**4.** **Allegation of Failure to Accommodate**

To state a plausible claim for relief in a failure to accommodate case under the ADA, Plaintiff must allege facts establishing: 1) that he had a disability within the meaning of the statute; 2) that the employer had notice of such disability; 3) that with reasonable accommodation he could perform the essential functions of the position; and 4) that the employer refused to make such accommodations. See 42 U.S.C.A. § 12101; Rhoads v. F.D.I.C., 257 F.3d 373 (4th Cir. 2001). However, the ADAAA, apparently in an attempt to resolve a circuit split,

provides that accommodations need not be given to "regarded as" employees. See 42 U.S.C. § 12201(h) ("A covered entity ... need not provide a reasonable accommodation ... to an individual who meets the definition of disability in section 12102(1) of this title solely under subparagraph (C) of such section [by being regarded as disabled.]"). See also Bateman v. Am. Airlines, Inc., 614 F. Supp. 2d 660, 673 (E.D. Va. 2009) (discussing ADAAA and prior split among the circuits about whether the ADA contemplated requiring accommodation for "regarded as" disabled employees."); Ryan v. Columbus Reg'l Healthcare Sys., Inc., No. 7:10-CV-234-BR, 2012 WL 1230234, at *5 (E.D.N.C. Apr. 12, 2012) ("the ADAAA has now clarified that an individual who is "regarded as" disabled is not entitled to a reasonable accommodation."). Because the court has found that Plaintiff has only presented evidence that he meets the definition of disabled by virtue of being regarded as disabled, Plaintiff's failure to accommodate claim must fail.

### B.  Wrongful Discharge in Violation of North Carolina Public Policy

As to Plaintiff's claim for wrongful discharge brought pursuant to the North Carolina Equal Employment Practices Act ("NCEEPA"), that law states in relevant part:

> It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers which regularly employ 15 or more employees.

N.C. Gen.Stat. § 143–422.2. The claim for wrongful discharge can be analyzed under the same analysis as the ADA claim. See, e.g., Moser v. Driller's Serv., Inc., 988 F. Supp. 2d 559, 565 (W.D.N.C. 2013); Matthews v. Novant Health, Inc., No. 3:09CV494-RJC-DSC, 2010 WL 2131559, at *7 (W.D.N.C. Apr. 29, 2010) (report and recommendation adopted) ("Regarding Plaintiff's state public policy claim, North Carolina courts 'look to federal decisions [in employment discrimination cases] for guidance in establishing evidentiary standards and

principles of law to be applied in discrimination cases.'") (quoting <u>N.C. Dept. of Correction v.</u> <u>Gibson,</u> 308 N.C. 131, 136, 301 S.E.2d 78, 82 (1983)). Because the court finds for the above reasons that Plaintiff is not entitled to relief under the ADA, his state law claim for wrongful discharge also fails.

### C. Alternative Claim for Breach of Contract

Plaintiff initially brought an alternative claim for breach of contract in his Complaint, <u>see</u> (#1-1 at ¶¶51-55), but failed to respond to Defendants' arguments regarding this claim in its Motion for Summary Judgment. <u>See</u> (#33). For this reason alone, the claim can be dismissed because Plaintiff abandoned it. <u>See</u> Fed. R. Civ. P. 56(e); <u>Williams v. Silver Spring Volunteer</u> <u>Fire Dep't</u>, 86 F. Supp. 3d 398, 419 (D. Md. 2015) ("By failing to address in her opposition any of the arguments raised by the [Defendant] relating to her disparate treatment claim, [Plaintiff] appears to have abandoned this claim."); <u>Rehabcare Grp. E., Inc. v. Brookwood Victoria Health</u> <u>Care Ctr., LLP</u>, No. CIV 106CV239, 2007 WL 2344811, at *6 (W.D.N.C. Aug. 15, 2007); <u>Patterson v. N. Carolina</u>, No. 5:12-CV-182-RJC, 2015 WL 163249, at *5 (W.D.N.C. Jan. 13, 2015). When asked about the claim at the hearing, Plaintiff failed to make any substantive argument on the contract breach issue. Additionally, even assuming that Plaintiff wished to pursue this claim, he has failed to offer any evidence as to how the contract, which expressly provided that either party could terminate the contract with or without cause upon 15 days notice, was violated. <u>See</u> <u>Poor v. Hill</u>, 530 S.E.2d 838, 843 (N.C. Ct. App. 2000). ("The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract."). Here, Minnesota Life sent Plaintiff a letter dated October 16, 2012 stating that Plaintiff was being terminated effective 15 days from the date of the letter. <u>See</u> (Dep. Ex. 30).

SFS sent Plaintiff a letter dated October 31, 2012 stating that Plaintiff would be terminated that same day. <u>See</u> (Dep. Ex. 24). After reviewing the contracts at issue, <u>see</u> (Dep. Ex. 43; 44; 45), it is not obvious to the court what provision therein, if any, serves as a basis for Plaintiff's breach of contract claim. As Plaintiff has not presented any legal or factual issues to the court on the breach of contract issue, the court will consider the facts as presented by Defendants undisputed for purposes of the motion and will grant summary judgment on this claim. <u>See</u> Fed. R. Civ. P. 56(c);(e).

### D. Alternative Claim for Unjust Enrichment

Plaintiff argues that Defendant was unjustly enriched by his termination based on the fact that he lost income and benefits as a result of his termination, including servicing fees he would have received on existing policies and commissions he would have received from sales of new policies. Plaintiff also argues that Defendant is being unjustly enriched because the premiums generated by the life insurance policies that he sold during his tenure are now going largely to Defendants. "Under a claim for unjust enrichment, a plaintiff must establish certain essential elements: (1) a measurable benefit was conferred on the defendant, (2) the defendant consciously accepted that benefit, and (3) the benefit was not conferred officiously or gratuitously." <u>Lake Toxaway Cmty. Ass'n, Inc. v. RYF Enterprises, LLC</u>, 742 S.E.2d 555, 561 (N.C. Ct. App. 2013). <u>See also</u> <u>Rosetta Stone Ltd. v. Google, Inc.</u>, 676 F.3d 144, 165-66 (4th Cir. 2012) ("A plaintiff asserting unjust enrichment must demonstrate the following three elements: (1) he conferred a benefit on [the defendant]; (2) [the defendant] knew of the benefit and should reasonably have expected to repay [the plaintiff]; and (3) [the defendant] accepted or retained the benefit without paying for its value.") (internal citations omitted). Here, Plaintiff cannot assert a claim for unjust

enrichment in light of the express contract of the parties dictating the terms of Plaintiff's work obligations to Defendants. Madison River Mgmt. Co. v. Bus. Mgmt. Software Corp., 351 F. Supp. 2d 436, 446 (M.D.N.C. 2005) ("claim for unjust enrichment may not be brought in the face of an express contractual relationship between the parties."). Thus, Plaintiff's claim for unjust enrichment fails.

### E.  Summary Judgment as to Defendant SFG

Finally, Defendant argues that summary judgment should be granted as to SFG because it was an improperly named party in this action and Plaintiff has failed to offer evidence sufficient to pierce the corporate veil. As noted above, SFG is the parent company of Minnesota Life and SFS. See Dwyer Aff. (#22-1, p. ) at ¶ 2. Generally, "a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." Channing v. Equifax, Inc., No. 5:11-CV-293-FL, 2013 WL 593942, at *3 (E.D.N.C. Feb. 15, 2013). See also Meyer v. Qualex, Inc., 388 F. Supp. 2d 630, 635 (E.D.N.C. 2005) ("When a subsidiary corporation hires employees, there is a strong presumption that it is the subsidiary, not the parent corporation, is the employer.") (citing Johnson v. Flowers Industries, Inc., 814 F.2d 978, 980 (4th Cir.1987)). Because the court finds that all of Plaintiff's claims fail at this summary judgment phase, it will not wade into a lengthy analysis of whether Plaintiff has satisfied his burden of piercing the corporate veil in order to determine whether SFG is a proper party to this lawsuit.[8]

---

8 Under North Carolina law, "[a] corporate parent cannot be held liable for the acts of its subsidiary unless the corporate structure is a sham and the subsidiary is nothing but a 'mere instrumentality' of the parent." Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 349 (4th Cir. 1998) (quoting B–W Acceptance Corp. v. Spencer, 149 S.E.2d 570, 575 (N.C. 1966)). "In order to find that a subsidiary is a mere instrumentality, North Carolina requires plaintiffs to show that the parent exercises '[c]ontrol, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own.'" Id.

## IV.   CONCLUSION

In light of the above analysis, the court finds that even in the light most favorable to Plaintiff, the totality of the evidence presented indicates that there is no genuine factual issue for trial and that no rational jury could find for Plaintiff on any of his asserted claims. Defendants are therefore entitled to judgment as a matter of law. See FED. R. CIV. P. 56(c); Sylvia Dev. Corp. v. Calvert Cty., Md., 48 F.3d 810, 817 (4th Cir. 1995). The court therefore enters the following Order.

## ORDER

**IT IS, THEREFORE, ORDERED** that Defendants' Motion for Summary Judgment (#21) is **GRANTED** and this action is **DISMISSED** with prejudice. The Clerk of Court shall enter a Judgment in accordance with such Order.

Signed: February 19, 2016

Max O. Cogburn Jr.
United States District Judge

---

(quoting Glenn v. Wagner, 329 S.E.2d 326, 330 (N.C. 1985)). Similarly, under federal common law, the corporate veil may be pierced "where (1) the shareholder dominates and controls the organization and (2) imposing such liability is needed to avoid injustice." Channing v. Equifax, Inc., No. 5:11-CV-293-FL, 2013 WL 593942, at *3 (E.D.N.C. Feb. 15, 2013) (citations and quotation marks omitted).